**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 1:22-cr-192 (BAH)** |
| | : | |
| **JENNIFER HORVATH,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Jennifer Horvath to two months of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

## I.    Introduction

Jennifer Horvath, 48, who is employed as a server/bartender, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on August 12, 2022, (ECF No. 21 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Horvath pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a sentence of incarceration is appropriate in this case because she (1) was among a group of rioters that surrounded, taunted, and assaulted Metropolitan Police Department ("MPD") officers as they arrived to defend the Capitol on January 6, 2021; (2) climbed through metal scaffolding to be one of the first rioters to reach the Northwest Courtyard; (3) unlawfully entered the Capitol Building through the Senate Wing Door at 2:18 p.m., just five minutes after the initial breach at that location; (4) entered a sensitive location, a Senate Conference Room; (5) proceeded toward the Crypt area of the Capitol Building while chanting, "who's house? Our house!"; (6) menacingly yelled, "Where's Nancy?" as she proceeded through the Capitol Building; (7) was part of the mob that overran and made physical contact with United States Capitol Police ("USCP") officers in the Crypt; (8) was instructed to leave the Capitol Building but remained on restricted Capitol Grounds for nearly 45 minutes, during which time she climbed to the top of a government vehicle; (9) re-entered the Capitol Building through a different door amidst a mass of rioters who pushed past police officers who were attempting to keep them out; (10) evaded officers who were attempting to clear the area near the Rotunda doors and then entered the Rotunda; and (11) made social media posts in the days following January 6, 2021 in which she falsely claimed that law enforcement officers protecting the Capitol were attempting to "agitate" the crowd "until Antifa positioned."

In addition to these many aggravating factors, the Court also should consider that Horvath was part of a large and violent riot that relied on numbers to overwhelm police officers who were guarding the Capitol Building, to breach the Capitol, and to disrupt the proceedings. *See United States v. Thomas Fee*, No. 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution.

And that assault was intended by many and by the mob at large in general to interfere with …
important democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor
out of that context.") (statement of Judge Bates). The defendant's actions and those of his fellow
rioters enabled the breach of the Capitol, threatened the lives of the police officers, legislators and
their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew
Mazzocco*, No. 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the
numbers. The people who were committing those violent acts did so because they had the safety
of numbers.") (statement of Judge Chutkan). Here, Horvath's conduct – including menacing and
overwhelming officers, making provocative statements like, "Where's Nancy?" as she proceeded
through the Capitol, twice entering into the Capitol Building, and evading officers who had just
cleared the Rotunda – support a sentence of two months of incarceration and 36 months of
probation in this case.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary repetition, the government refers to the general summary of the
attack on the U.S. Capitol. *See* ECF No. 21 (Statement of Offense), at ¶¶ 1-7. As this Court knows,
a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most
violent—contributed, directly and indirectly, to the violence and destruction of that day. With that
backdrop we turn to Horvath's conduct and behavior on January 6.

### *Jennifer Horvath's Role in the January 6, 2021 Attack on the Capitol*

Prior to January 6, 2021, Jennifer Horvath and her boyfriend, Glen Wes Lee Croy, picked
up Terry Lynn Lindsey in Piqua, Ohio and they drove together to Washington D.C. to attend a
political rally on January 6, 2021. ECF No. 21 at ¶ 8. On that morning, Horvath, Croy, and Lindsey

went to a political rally at the Ellipse on the National Mall. *Id.* Following the rally, Horvath, Croy, and Lindsey walked with a crowd to the United States Capitol Grounds. *Id.* Horvath, Croy, and Lindsey stood on the West Lawn part of the Capitol Grounds, a restricted area, for approximately one hour as police officers engaged with the crowd and deployed tear gas. *Id.* at ¶ 9.

In a video of this incident that Horvath posted to her Rumble social media account, she can be heard yelling obscenities at the officers and stating, "oh, they know we're going to get up there." The video, posted by Horvath on January 10, 2021, included a caption, "Cops were throwing flash bangs when we got there and the crowd itself was fairly new. They were teying [sic] to agitate us till antifa positioned." ECF No. 21 at ¶ 16. The government intends to submit Horvath's Rumble social media post as Exhibit 1.



*Figure 1: Horvath (wearing red baseball cap), standing behind Wes Croy (wearing grey sweatshirt) and in front of Terry Lindsey (wearing blue jacket and carrying American flag), taking cell phone video of rioters engaging with U.S. Capitol Police officers on the Northwest Steps to the Capitol Building.*

At approximately 2:00 p.m., Horvath, Croy, and Lindsey joined other individuals on the West Lawn who surrounded a group of MPD Officers, attempted to prevent the officers' access to the Capitol Building, and yelled at the officers. ECF No. 21 at ¶ 16. The rioters, including Lindsey

and Croy, surrounded and taunted the officers, accused them of being "oathbreakers," and implored the officers to retreat, as Horvath stood nearby. *Id.* During the skirmish, Lindsey briefly pushed a uniformed MPD officer.



*Figure 2: Horvath (circled in red), standing behind Croy (wearing grey sweatshirt), as the crowd surrounds and taunts MPD officers attempting to reach the Capitol Building. The government intends to submit body-worn camera footage of this incident as Exhibit 2.*

At approximately 2:11 p.m., Horvath climbed through metal scaffolding to get from the West Lawn to the Upper West Terrace area of the U.S. Capitol Grounds. ECF No. 21 at ¶ 10. Horvath entered the U.S. Capitol Building at approximately 2:18 p.m. through the Senate Wing Door. *Id.* at ¶ 11. As she entered, she yelled, "Where's Nancy?" and "Oh, Nancy," referring to Speaker of the House Nancy Pelosi, while others chanted, "Where's the traitors?"



*Figure 3: Horvath enters the U.S. Capitol Building through the Senate Wing Door at 2:18 p.m. The government intends to submit Horvath's cell phone video of her entry into the Capitol Building as Exhibit 3.*

Horvath walked into a Senate conference room, S145, and then marched with the crowd toward the Crypt area of the Capitol Building. While marching, she joined the crowd chanting, "Whose House?  Our House." ECF No. 21 at ¶ 12.



*Figure 4: Horvath, Croy, and Lindsey, shortly after entering the Capitol Building, chanting. The government intends to provide video footage of Horvath's entry into the Capitol Building as Exhibit 4.*

From there, Horvath walked into the Crypt and joined the crowd as it overwhelmed officers who were attempting to prevent the rioters from entering further into the Capitol Building. ECF No. 21 at ¶ 12.



*Figure 5: Horvath, standing among the rioters in the Crypt prior to the crowd overwhelming the officers and proceeding further into the Capitol Building. Exhibit 4 includes footage from this incident.*



*Figure 6: CCTV footage from the Crypt just before Horvath and other rioters overwhelmed the officers. Certain USCP officers are identified by red circles.*

While inside the U.S. Capitol Building, Horvath placed a baseball cap and sunglasses on a bust of Winston Churchill and took a digital photograph of Lindsey and Croy in front of a bust of Abraham Lincoln entitled, "Lincoln the Legislator," which they later distributed widely to others. ECF No. 21 at ¶ 13. In a chilling cell phone video recorded by Croy, members of the crowd can be heard yelling "Come on, who's back there," "Come on out," "It's our fucking house, not your house," and "Where's our votes." Horvath herself can be heard saying, "Where's Nancy Pelosi? Where is she?"

 

*Figures 7 and 8: cell phone footage of Horvath placing a hat and sunglasses on a bust of Winston Churchill. The government intends to submit this cell phone video as Exhibit 5.*

After Croy was ordered to leave the Capitol building by USCP Officers, Horvath, Croy, and Lindsey exited the building through the Memorial Door at approximately 2:37 p.m. They had been inside the building for approximately 20 minutes at that point. ECF No. 21 at ¶ 13. Once outside the Capitol Building, Lindsey, Croy, and Horvath remained on the grounds of the building for approximately 40 to 45 minutes. *Id.* at ¶ 14. During that time, Horvath climbed onto a government vehicle and, when told by another rioter to get off of the vehicle, responded, "It's our fucking vehicle. We paid for it." The government intends to submit Horvath's cell phone video of this incident as Exhibit 6.

At approximately 3:21 p.m., Horvath, Croy, and Lindsey re-entered the Capitol Building through the Rotunda doors. ECF No. 21 at ¶ 15. Cell phone video taken by Croy shows the chaos

at that location and time as a door alarm sounded and officers attempted to clear the Capitol Building. Clearly audible in the video is an individual stating, "They're pushing everybody out." *See* Exhibit 7 (to be provided to the Court). But Horvath was not dissuaded.





*Figures 9 and 10: Horvath re-enters the Capitol Building. The government intends to provide video footage of Lindsey's re-entry into the Capitol Building as Exhibit 8.*

Horvath, Croy, and Lindsey then entered the Rotunda before being forced to exit the Capitol Building again through the Memorial Door at approximately 3:29 p.m. ECF No. 21 at ¶ 15. While inside the Rotunda, an MPD officer recovered a canister of pepper spray from near Horvath. Although she denied that the pepper spray was hers, the officer instructed Horvath to get to the ground and escorted her from the Rotunda, stating that the pepper spray was hers.



*Figure 11: Horvath being accused by MPD officers of possessing pepper spray in the Rotunda. The government intends to provide body-cam footage of this incident as Exhibit 9.*

### The Charges and Plea Agreement

On March 10, 2022, the United States charged Horvath by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On May 3, 2022, law enforcement officers arrested her after she reported to the federal courthouse in Denver Colorado. On May 27, 2022, the United States charged Horvath by a four-count Information with the same offenses. On August 12, 2022, pursuant to a plea agreement, Horvath pleaded guilty to Count Four of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G),

Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, Horvath agreed to pay $500 in restitution to the Architect of the Capitol.

### III.  Statutory Penalties

Horvath now has been convicted of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement, Submission by the United States in Support of Guilty Plea, and Presentence Investigation Report, she faces up to six months of imprisonment and a fine of up to $5,000. Horvath must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.  Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a period of incarceration.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic

norms and practices. Indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Horvath's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Horvath personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Horvath is therefore not a mitigating factor in this case.

In light of these factors, a sentence of two months in prison followed by 36 months of probation is warranted. Horvath entered the Capitol Building twice: first, just five minutes after

the Building was breached on the west side, and then a second time at the Rotunda Doors on the east side, 45 minutes after she and her party had been expelled by the police. Horvath pushed her way back through the Rotunda Doors while officers were attempting to clear the hallway outside the Rotunda. As this Court explained when sentencing Lindsey, "every defendant who appears in front of me who entered the Capitol Building twice gets incarcerated." *United States v. Terry Lynn Lindsey*, No. 21-cr-162(2) (BAH), Tr. 07/15/22 at 56.

Horvath also watched as her boyfriend and his associate impeded, taunted, and assaulted MPD officers as they arrived on Capitol Grounds to defend the building. Horvath entered the Capitol Building through a broken door, just five minutes after it was initially breached, passing shattered windows and even videotaping the damage that earlier rioters had caused. Horvath was inside the Capitol Building a total of 27 minutes and had to be forced out of the building *two times* by police officers. In cell phone footage she took during her entry, Horvath went into conference room S145 and was part of the mob that eventually overran officers in the Crypt. She repeatedly made menacing statements such as, "Where's Nancy?" While inside, Horvath took photos and video of herself dressing up statues, displaying a lack of concern about how she participated in the riot and, through her presence, aided other, more violent rioters.

While outside, Horvath stood on a government vehicle and stated that she was entitled to do so because, "It's our fucking vehicle. We paid for it." During her second entry, Horvath went to great effort to evade officers and enter the Rotunda. She plowed into the building in a crowd of other rioters, ignoring the officers' attempts to repel the crowd and the alarm sounding as she re-entered. Officers believed that she also possessed pepper spray inside the Rotunda. Horvath then posted two videos to her social media account, which served to glorify the riot at the Capitol Building and included the false statement that the officers defending the Capitol actually were

13

trying to "agitate" the crowd "till antifa positioned." But, as the Court has explained, "a 'blame the cops' excuse is no excuse at all." Lindsey Tr. 07/15/22 at 53. Such a statement "makes a mockery of the heroic efforts made by the beleaguered law enforcement officers that day, and mischaracterizes [Horvath] and other rioters as the victims that day." *Id.* at 54-55.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration.

### B.   The History and Characteristics of Horvath

As set forth in the PSR, Horvath's criminal history consists of two misdemeanor convictions—for operating a vehicle while intoxicated in 2006 and 2010—and three traffic infractions. PSR ¶¶ 30-31. Although Horvath told the probation officer that she ceased using marijuana "approximately two years ago," PSR ¶ 55, that is not consistent with the information provided to the FBI by individuals who know Horvath.

Although she was difficult to locate prior to her arrest, Horvath self-reported to the federal courthouse. She promptly entered a guilty plea, acknowledging her conduct and resolving this case. She has been compliant with her conditions of pre-trial release.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the

January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, No. 21-cr-238-TFH, Tr.

08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any

presumption of probation. I think the presumption should be that these offenses were an attack on

our democracy and that jail time is usually—should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime

generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir.

2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every

case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most

compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

deterred." *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 (statement of

Judge Nichols at sentencing). A sentence less than incarceration here would send would-be rioters

"that you can do what happened on January 6th, you can associate yourself with that behavior and

that there's no real consequence, [and] then people will say why not do it again." *United States v.*

*Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 (statement of Judge Walton).

General deterrence is an important consideration because many of the rioters intended that

their attack on the Capitol would disrupt, if not prevent, one of the most important democratic

processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge

Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to
> attack the Capitol to prevent our elected officials from both parties from performing
> their constitutional and statutory duty, democracy is in trouble. The damage that
> [Defendant] and others caused that day goes way beyond the several-hour delay in
> the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was [before January 6, 2021] for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

This Court has stated that a lengthy period of probation following incarceration also furthers general deterrence. In *Lindsey,* this Court explained,

> [M]y standard probationary supervision period that I have been imposing on J6
> defendants, in order to ensure that people who are susceptible to believing in
> conspiracy theories and the "Big Lie" that the 2020 presidential election was stolen
> and – because of the susceptibility are people who have plainly – have expressed
> willingness to engage in political violence, that a 36-month period of probation is
> both important for specific deterrence. And for that particular defendant with that
> susceptibility to political violence and political action based on beliefs in
> conspiracy theories that are unfounded and baseless and spurious – and for a general
> deterrence as well.

*United States v. Terry Lynn Lindsey*, No. 21-cr-162(2) (BAH), Tr. 07/15/22 at 32.

*Specific Deterrence*

The need for specific deterrence in this case is apparent in light of Horvath's casual disregard for the consequences of her actions and later efforts to defend the riot as a result of officer

antagonism or "Antifa." Horvath witnessed violence and contributed to it through her presence and loud calls to locate Speaker Nancy Pelosi. Yet, after the riot, she seemed proud of her actions, posting two videos of her unlawful presence on restricted Capitol grounds.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress. This Court must sentence Horvath based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot. Although those like Horvath convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default.[3] *See United States v. Anna Morgan-Lloyd*, No. 21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, No. 21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

---

[3]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, No. 21-cr-00164 (RCL); *United States v. Valerie Elaine Ehrke*, No. 21-cr-00097 (PFF); and *United States v. Donna Sue Bissey*, No. 21-cr-00165 (TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Horvath has pleaded guilty to Count Four of the Information, charging her with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor, to which the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although numerous defendants participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with

significant distinguishing features, including the historic assault on the seat of the legislative branch of the federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and the large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the exact same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. The best comparison for Horvath is that of her fellow travelers, Wes Croy and Terry Lindsey.

The government makes the same recommendation for Horvath as it did for her boyfriend, Wes Croy: two months of imprisonment. This Court sentenced Croy to a 36-month term of probation including 14 days in a residential reentry center. *See United States v. Glenn Wes Lee Croy*, No. 21-cr-00162(1), ECF No. 58. Croy entered an early guilty plea to the same offense as Horvath – Parading, Demonstrating, or Picketing in a Capitol Building. Croy traveled with Horvath to the rally on the ellipse and accompanied her almost the entire day on January 6, 2021. Although Croy had several prior arrests, he, like Horvath, probably would have no criminal history points and a Criminal History Category of I if the Sentencing Guidelines applied to his offense of conviction. The government has no evidence that Croy pushed an officer, used illegal substances on Capitol grounds, misled the FBI during his interview, committed offenses during the pendency of his case, or violated the terms of his release. Like Horavth, he entered a prompt guilty plea.

However, there is reason to impose a two month custodial sentence here even though Croy was sentenced to just 14 days in a residential reentry center. Most significantly, unlike Croy,

Horvath made much more egregious statements during her time in the Capitol Building, including her stated query about where the Speaker of the House was hiding during the riot. That statement clearly suggested that Horvath, joined by her fellow rioters intended to cause harm to the Speaker. And even if Horvath now contends that she never meant to actually harm the Speaker, her remark easily could have incited more violent rioters to try to locate the Speaker in order to harm her. And although the Speaker was escorted to safety shortly after the rioters entered the Capitol, many Congressional staffers and other employees were not, and had to fearfully shelter in their offices with makeshift barricades. *See* https://www.bostonglobe.com/2022/01/04/nation/behind-scenes-scene-crime-congressional-staffers-recall-lingering-trauma-jan-6-attack/ (visited October 12, 2022); https://www.washingtonpost.com/politics/inside-capitol-siege/2021/01/09/e3ad3274-5283-11eb-bda4-615aaefd0555_story.html (visited October 12, 2022). One shudders to think what might have happened had the rioters broke through the staffers' defense.

Unlike Croy, Horvath also climbed on a government vehicle, exclaiming that she was entitled to do so because she "paid for it." Unlike Croy—who submitted to a voluntary interview with the FBI and identified Horvath—Horvath did not cooperate with the government or provide any information in its investigation.

As this Court recognized when sentencing Lindsey to concurrent terms of five months incarceration on the Class B misdemeanor counts, followed by 36 months of probation on the Class A misdemeanor, his "conduct both during and after January 6th, as well as his criminal history, constitute several aggravating and unique factors that set him apart from his codefendant Croy and warrant[ed] the imposition of a longer sentence." *United States v. Terry Lynn Lindsey*, No. 21-cr-00162(2) (BAH), Tr. 07/15/22 at 64.

> Unlike Croy, [Lindsey] physically shoved a police officer, used illegal substances on Capitol grounds, evaded law enforcement during a second entry into the Capitol

Building, threatened to return to the Capitol with guns, lied to and misled the FBI during his post-arrest interview, committed offenses and pretrial release violations during the pendency of his case, and entered a belated plea agreement more than a year after his arrest and just shortly before the scheduled trial date.

*Id.* at 64-65. Upon his sentencing for three misdemeanor offenses, including 18 U.S.C. § 1752(a)(1), the government recommended a period of incarceration of one year, followed by supervised release of one year. *Id.* at 31. The government believes that the nature and circumstances of Horvath's conduct, and her history and characteristics counsel a less significant period of incarceration than that imposed on Lindsey.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

Section 3561(a)(3) allows for the imposition of both a term of probation and a term of imprisonment for a single Class B misdemeanor. As Judge Lamberth held in *United States v. Little*, that statute permits a sentencing judge to impose a term of probation at the same time as a term of imprisonment when a defendant is sentenced to imprisonment for only a petty offense or offenses.

*United States v. Little,* 21-cr-00315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022), appeal pending, No. 22-3018 (D.C. Cir.). A number of other judges in this District have adopted the same position. *See, e.g., United States v. Sarko*, No. 21-cr-00591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. 21-cr-00342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-00290 (RBW), ECF No. 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, No. 21-cr-00630 (CJN), ECF No. 37 (D.D.C. Apr. 22, 2022) (same); *United States v. Entrekin*, No. 21-cr-00686 (FYP), ECF No. 34 (D.D.C. May 6, 2022) (same); *United States v. Revlett*, No. 21-cr-00281 (JEB), ECF No. 46 (D.D.C. July 7, 2022) (same); *United States v. Getsinger*, No. 21-cr-00607 (EGS), ECF No. 60 (D.D.C. July 12, 2022) (same); *United States v. Ticas*, No. 21-cr-00601 (JDB), ECF No. 40 (D.D.C. July 15, 2022) (same).

Horvath pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see also United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years of probation).

## VI.    Conclusion

For the reasons set forth above, the government recommends that the Court sentence Jennifer Horvath to two months of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution. Such a sentence reflects the seriousness of Horvath's criminal conduct on January 6, protects the community, promotes respect for the law, and deters future

crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing her prompt acceptance of responsibility.

Respectfully Submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
DC BAR NO. 481052

By:    */s/ Jordan A. Konig*
JORDAN A. KONIG
Supervisory Trial Attorney,
U.S. Department of Justice
Detailed to the U.S. Attorney's Office
For the District of Columbia
P.O. Box 55, Washington, D.C. 20044
202-305-7917 (v) / 202-514-5238 (f)
Jordan.A.Konig@usdoj.gov